**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ricardo NAVA–SALAZAR, also known as
"Jose", Guillermo Casas, Darley Usma,
also known as "Charlie", Ramon B.
Vasquez, Juan Rodriguez–Garcia, Defendants–Appellants.**

**Nos. 91–1003, 91–1041, 91–1042,
91–1052 and 91–1200.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1993.

Decided July 13, 1994.

Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Joseph D. Heyd (argued), Office of U.S. Atty., Chicago, IL, for U.S.

Marvin J. Leavitt, Leavitt & Schneider, Chicago, IL (argued), for Ricardo Nava–Salazar.

Gary Senner, Sanford M. Pastroff (argued), Karen Joan Dilibert, Emily Nozick, Jonathan Piper, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Guillermo Casas.

Allan A. Ackerman, Chicago, IL (argued), for Darley Usma and Ramon B. Vasquez.

Before CUMMINGS, FRIEDMAN,* and CUDAHY, Circuit Judges.

FRIEDMAN, Circuit Judge.

In these consolidated appeals the five appellants challenge their jury convictions in the United States District Court for the Northern District of Illinois of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Three of the appellants challenge their convictions of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. One appellant also challenges his sentence. The criminal prosecution stemmed from an attempt to import and distribute a large quantity of cocaine, in which undercover agents of the Drug Enforcement Administration (DEA) played a significant role.

The appellants raise a number of issues. We reject all of their contentions and affirm the convictions and sentence.

I.

A. The jury could have found the following facts and drawn the following inferences from the evidence:

1. DEA agents in South Florida learned from confidential informants that the appellant Usma and others wanted to import large quantities of cocaine from Colombia to the United States. The DEA agents represented themselves to be drug traffickers with access to aircraft and facilities to pick up cocaine in Colombia, transport it into the United States, and deliver it for subsequent distribution.

On May 19, 1989, DEA agent Crawford met with Usma and Maya (a DEA contract pilot) in Florida. Usma introduced Crawford to Francis, an indicted conspirator who is a fugitive. Maya agreed with Francis and Usma to go to Colombia and make arrangements to use a clandestine airstrip to pick up the cocaine. Usma met Maya a few days later at the Miami International Airport, where Maya boarded a plane for Colombia. While in Colombia, Maya met Diego, who would supply the cocaine. Maya learned the location of the airstrip from Diego and received a radio frequency for reaching Diego.

On June 2, 1989, agent Crawford took Usma and Francis to inspect an undercover airplane hangar and an office, which he proposed they use. DEA agent Calderolli, posing as Crawford's partner, met the group at this undercover location. The group discussed the transportation of the first shipment of cocaine. Usma used a navigation chart to pinpoint the location of the airstrip in Colombia that Diego had disclosed to Maya. Usma and Francis discussed when the flight would be made, and Usma assured the agents that before the flight he would send them money to cover their expenses. Usma later paid Luis Salazar (a DEA infor-

* Daniel M. Friedman, Circuit Judge for the Federal Circuit, sitting by designation.

mant) $95,000 for expenses on the first shipment.

While they inspected the planes, Francis and Usma discussed whether to deliver the first shipment to Chicago or New York, and Usma ultimately decided on New York. Francis also discussed the number of bales of cocaine in each shipment.

On June 16, Usma met with Crawford, and told him the contact in Chicago would be "Jose" (the appellant Nava) and confirmed a pager number at which Jose could be reached.

2. The next day Maya flew a DEA plane to the designated airstrip in Colombia, picked up 500 kilograms of cocaine and returned to Florida. DEA agents met the plane in Tampa and obtained the cocaine.

Crawford flew to Chicago that same day and called the appellant Nava at the pager number Usma had provided.

After discussions and meetings at which they discussed the transportation of the cocaine to Chicago and the arrangements for turning it over, Nava gave Crawford papers and keys to a red van that had been rented under a false name and which Crawford would use to deliver the cocaine. Nava stated that he had to deliver 300 kilograms immediately to "Guillermo" (the appellant Casas) and that he would sell the rest.

The DEA flew the 500 kilograms of cocaine to Chicago on June 18. Usma was delayed in reaching Chicago, so the DEA stored the cocaine and postponed delivery until the following day.

The next day, after the appellant Casas returned a page from Nava's telephone, Casas joined Usma, Luis, Salazar and Nava at the Holiday Inn parking lot. Casas and Nava carried a box into the hotel; Casas later admitted that he had delivered $45,000 in expense money for the 500 kilogram cocaine shipment.

Crawford then drove a red van into the parking lot. Usma and Crawford removed the van seats to make room for the cocaine. In response to Crawford's anger over Usma's delay, Usma assured Crawford that "next time is for ready." At Nava's direction, Crawford, Usma and Nava retrieved some signs to put on the van. Crawford, Nava and Usma drove to their rendezvous point, a truckstop, in three separate vehicles.

Crawford continued to the airport, met the DEA agents with the cocaine, and drove back with the cocaine in the van to the truckstop, where the undercover DEA agents met with Nava and Usma. Nava was noticeably nervous. Usma asked about the cocaine, and then told Nava, "You know what to do." Nava got the keys to the red van from Crawford, gave a beeper to Usma, and everyone agreed to meet later at the Holiday Inn. After the cocaine was loaded in the van and Nava checked to make sure that the bales were not visible from the windows, Nava drove away.

The Illinois State Police stopped Nava for speeding. Nava consented to a search of the van. Upon discovering the cocaine, the police arrested Nava and seized the van. When arrested, Nava had a mobile phone and Casas' business card. After Usma saw the van being stopped, he checked out of his hotel and called Casas from a new hotel.

3. DEA agents later renewed contact with the smugglers and offered to provide transportation for additional shipments of cocaine, as Francis and Usma had discussed. On July 27, 1989, a little more than a month after Nava's arrest, DEA agent Reina called Diego in Colombia, and they discussed what went wrong with the 500 kilogram shipment. Diego told Reina he had been receiving information from Usma and Francis about what happened. Reina offered his services for future shipments of cocaine to the United States and Diego said he was interested.

Reina called Diego several more times. They discussed the amount still owed to Crawford's people for their work on the first shipment. Diego agreed with Reina's suggestion that Francis and Usma should not participate in future shipments and that Reina should deal directly with Diego or his brother who, Diego stated, knew Casas. Diego indicated he would send his right-hand man to inspect the Florida facilities.

In August 1989, Reina learned that Diego had been murdered in Colombia. Reina then

returned a call from Diego's brother Pinguino, also known as Fanor Arizabaleta. Pinguino asked about the persons involved in the first shipment of cocaine, and mentioned that Usma worked for him long ago. Pinguino wanted to continue the business arrangement with Reina that Diego had begun. Reina and Pinguino spoke several times.

Pinguino agreed to pay Reina the same fee for the next shipment, and $200,000 up front as a deposit. Pinguino told Reina he would send "Jorge" (the appellant Vasquez) to meet him. Pinguino told Reina that Vasquez had worked for him for eleven years. Pinguino asked if Reina could transport future cocaine shipments through Mexico into the western United States, and Reina said that was possible.

On August 22, 1989, while talking with Reina, Pinguino mentioned that Usma was in Colombia. Pinguino knew that Usma was aware of Diego's deals, including the seized 500 kilogram shipment. Pinguino reassured Reina that Vasquez would arrange a meeting and mentioned that Vasquez was in Colombia delivering money for him.

Soon after, Reina received a call from the appellant Rodriguez, who arranged to meet Reina to inspect Reina's transportation facilities for future shipments of cocaine. Reina and Crawford picked up Rodriguez, who told them his job was to inspect the planes and facilities and report back to Pinguino and Vasquez. The next day Pinguino told Reina that he had already spoken with Rodriguez, who reported that the facilities were all right, and with Vasquez, who was evaluating what Rodriguez told him. Pinguino discussed sending future shipments via Mexico and wanted Vasquez to be informed about this. Pinguino also indicated there would be a delay in the next shipment because the airstrip Maya had used in their prior deal with Diego was not available. Pinguino said he would have Vasquez call Reina.

After that telephone conversation with Pinguino, Reina received a call from Vasquez, who had returned from Colombia, where he was working with Pinguino. Vasquez discussed with Reina the negotiations for the next shipment and indicated that he wanted to meet with Reina. Reina arranged a meeting with Vasquez and Rodriguez.

On September 5, 1989 Reina met with Vasquez and Rodriguez. Vasquez spoke at length about Usma and Francis and knew all about the first 500 kilogram shipment. Vasquez also told Reina that Francis and Usma claimed Reina was a federal agent and that they were offering to transport the next load themselves. Vasquez also discussed the murder of Diego, the continuation of business with Pinguino, and Vasquez' giving Reina a $200,000 deposit. They agreed that the next shipment would take place in late September.

The next day, in a telephone conversation with Reina, Pinguino indicated that he had access to the airstrip used for the first shipment and discussed when the second shipment would be made. Pinguino agreed to deliver $200,000 through Vasquez, who at the time was doing some errands for Pinguino in Houston. Pinguino asked Reina how many 500–kilogram shipments Reina could handle a month. Reina answered they could do three or four.

Pinguino also told Reina that Usma had worked for him for five years, and had met with him to discuss the first deal. Usma told Pinguino that he got the first deal rolling by introducing Salazar to Francis. Pinguino assured Reina that he was working with Reina now and not with Usma and Francis. Pinguino confirmed that Reina would be paid $1.75 million for the next shipment, and told Reina he wanted it delivered to two different sites in the United States.

On September 13, Reina, Salazar, and Crawford met with Vasquez. Vasquez again showed familiarity with the first shipment and questioned them about the negotiations with Usma and Francis, the delivery of money by Casas, and the arrest of Nava. Vasquez told the agents he would coordinate all the details with Pinguino for the next cocaine shipment, the delivery of the $200,000, the location of the landing strip in Colombia, the date of the shipment, the quantity to be shipped, and the communication frequencies to be used. Over the following two weeks, Reina spoke with both Pinguino and Vasquez to arrange for the $200,000 deposit. Vasquez told Reina to prepare a list of radio frequen-

cies and code words and gave Reina telephone numbers to reach Pinguino at a clandestine cocaine laboratory in Colombia. On September 25, Vasquez agreed with Reina to deliver the $200,000 the following day.

On September 26, 1989, pursuant to Vasquez's instructions, Reina and Rodriguez drove to a location where, after Reina honked the horn three times, an unknown man delivered $200,020 cash. Reina gave Rodriguez a card with code words and radio frequencies.

Pinguino continued to negotiate with Reina for cocaine shipments to be transported through either Mexico or Miami. On October 10, Vasquez called Reina and indicated he would be working with Pinguino regarding the next shipments, despite Vasquez' earlier fears regarding surveillance of prior meetings he had with Reina. In mid-October 1989, Pinguino said that he needed to move three to four thousand kilograms out of Colombia as soon as possible. Pinguino offered to pay the debt Usma and Francis owed to Crawford's people from the first shipment, over the period of the next several shipments. Pinguino added that Usma would be involved in these subsequent shipments. Reina and Pinguino arranged to meet regarding the next shipments. Pinguino had attempted to establish radio contact with Reina by using the radio frequencies that Reina gave to Rodriguez. Vasquez, on orders from Pinguino, picked up more money at a gas station to finance the next shipments.

4. The additional shipments of cocaine never occurred. In late October 1989 Reina lost contact with Pinguino and on November 1, Pinguino's son informed Reina that Pinguino had gone into hiding. The DEA terminated the undercover investigation and arrested Casas, Usma, Vasquez, and Rodriguez.

Upon his arrest, Casas admitted that he had delivered money to the hotel as part of a 500–kilogram cocaine transaction involving Francis, Usma and Nava. From above a trapdoor in Casas' bedroom closet, DEA agents recovered briefcases and a bag filled with large sums of cash, some notebooks, and a personal telephone directory. Various telephone numbers in the directory linked Casas to the other appellants, and the notebooks contained records and tabulations of multiple multi-kilogram cocaine transactions.

Vasquez and Rodriguez were arrested at Vasquez' place of business in Florida. The DEA there seized a box containing $288,000 in cash. Vasquez admitted he had collected the money for Pinguino to be delivered to Reina as a deposit for the next shipments of cocaine. Rodriguez told the DEA Vasquez had hired him to assist with a cocaine transaction. He added that he heard Vasquez mention Pinguino, whom he had never met.

Telephone records also showed contacts between and among Casas, Nava, Usma and Francis.

B. The original indictment charged only Nava with possession of cocaine. Superseding indictments charged all five appellants with conspiracy to possess with intent to distribute cocaine and three with possession of cocaine. The jury ultimately convicted all the appellants as charged. The court sentenced the appellants to imprisonment for terms ranging from 156 to 348 months.

## II.

A. All the appellants contend that there was a fatal variance between the crime charged in the conspiracy count of the indictment and the government's proof. They assert that although the indictment charged a single conspiracy from May to November 1989, the government proved two separate and different conspiracies: the first began in May 1989 and ended on June 19, when Nava was arrested and 500 kilograms of cocaine were seized; and a second that began after June 19 and continued to November 1989, when the four other appellants were arrested. The appellants argue that the jury could have convicted them because it found that they were members of a conspiracy unrelated to their activity, and that if that had occurred, they were convicted of a crime other than that charged in the indictment.

The court gave the jury lengthy and detailed instructions regarding single and multiple conspiracies, which prevented the jury from taking that course. The court noted that the defendants contended that "the gov-

ernment's evidence fails to prove ... the existence of a single overall conspiracy. Rather, the defendants argue that there were actually several separate and independent series of events involving various individuals and various goals, and that none of these series of events is within or is part of the overall conspiracy described in the indictment." It stated that "[w]hether there was one conspiracy, two conspiracies, multiple conspiracies or no conspiracy at all is a fact for you to determine in accordance with these instructions." After explaining the basis for determining the existence of a conspiracy and that "[s]eparate agreements may form the basis for a single ongoing conspiracy if the parties to such agreements are joined by their knowledge of the conspiracy's common goal," the court charged:

> If you find ... that there was one overall conspiracy as alleged ... and that a particular defendant was a member of that conspiracy, you should find that defendant guilty ...
>
> If you find ... that there were two or more conspiracies and that a particular defendant was a member of one or more of those conspiracies, you may find that defendant guilty ... only if you further find ... that this proven conspiracy was included within the conspiracy alleged in Count One. If, on the other hand, the proven conspiracy is not included within the conspiracy alleged in Count One, you should find that defendant not guilty of Count One.

When the jury found the appellants guilty of conspiracy, it necessarily found under the court's instructions that each of them was a member of the single conspiracy the indictment charged and that, if some of them also participated in a second conspiracy, that conspiracy was part of the first conspiracy.

■ "[A] conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy. Whether a single conspiracy exists is a question of fact; consequently '[t]he jury gets first crack at deciding "whether there is one conspiracy or several when the possibility of a variance ap-

pears." ' " United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir.1991) (quoting United States v. Paiz, 905 F.2d 1014, 1019 (7th Cir.1990), cert. denied, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991)). This court will uphold a jury's factual conclusion that a single conspiracy existed if "any rational trier of fact could have found, beyond a reasonable doubt, the one conspiracy." United States v. Emenogha, 1 F.3d 473, 480 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994) (quoting Paiz, 905 F.2d at 1019).

■ The question, therefore, is whether the evidence supports the jury's finding of a single conspiracy. It does.

The government presented abundant evidence that all five appellants were members of a single organization that planned and executed a scheme to import from Colombia and distribute in the United States large quantities of cocaine. That evidence included the testimony of experienced undercover agents who dealt directly with the appellants; tape-recorded statements by the appellants and other co-conspirators; the 500 kilograms of cocaine seized from the appellant Nava; pagers; mobile telephones; large amounts of cash; other physical evidence; and post-arrest admissions by the appellants Casas, Vasquez, and Rodriguez. A reasonable jury could find that this evidence established a single conspiracy among the appellants that continued from the first contacts by DEA agents with the conspirators in May 1989 until the four appellants (other than Nava) were arrested in November 1989.

There were substantial similarities between the operational methods for the first importation of the 500 kilograms of cocaine and the subsequently planned further importations, which also contemplated 500 kilogram packages. Diego negotiated the first shipment with DEA agents and, after Nava's arrest, continued to be the DEA contact in Colombia until he was murdered. His brother Pinguino then assumed that role. Pinguino knew Casas and Usma from previous dealings. The proposed future shipments Pinguino discussed were identical to the first transaction in price, amount, deposit re-

quired, the clandestine airstrip to be used, the pilot (Maya) and United States contact (Salazar).

The linkage between the first and second shipments also was confirmed by the indebtedness that Diego, Usma, and Francis recognized they still owed to Crawford and the other undercover DEA agents. Pinguino agreed to pay this debt out of future deals and indicated that Usma would again play an active role in the transactions. Vasquez and Rodriguez knew the details of the first shipment and discussed this transaction at length with Reina.

The records seized from Casas also provided evidence that the defendants were part of the same organization. Casas' address book included phone numbers for Usma and indicated he had had contact with Usma after the first shipment, indicating an ongoing relationship. Usma, while in Colombia with Pinguino, made contact with Casas. Usma and Vasquez met in Colombia with Pinguino and arranged for future shipments.

The fact that there were different participants in the conspiracy before and after Nava was arrested did not establish that there was not a single conspiracy. "The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies." *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969).

The appellants contend, however, that the only common links between the events before and after Casas' arrest and the seizure of the first shipment were the activities of the government agents. As we have shown, there was ample evidence apart from the government agents' actions to support the jury's finding of a single conspiracy. Moreover, the court properly instructed the jury that "at least two of the conspirators must be persons who are not government agents or informants. [And that a] government agent or an informant is not a coconspirator."

The appellants' reliance on *United States v. Johnson*, 515 F.2d 730, 733 n. 10 (7th Cir.1975), is misplaced because there we held that, as a matter of law, the jury could not have found a single overall conspiracy. On the different facts of the present case, we have reached the opposite conclusion.

■ B. Our holding that the jury justifiably found a single conspiracy also is dispositive of the appellants' ancillary arguments based on their multiple conspiracy theory. The court did not abuse its discretion in refusing to instruct the jury not to consider evidence of unrelated conspiracies. The conspiracy instructions adequately explained the basis upon which the jury was to determine each defendant's individual guilt or innocence. After extensive discussion, all the appellants ultimately agreed to the instruction that, if the jury found that there were two or more conspiracies, it also must find that any other conspiracy of which the appellant was a member was part of the conspiracy charged in the indictment.

■ The appellants also contend that they were entitled to a limiting instruction precluding the jury from using evidence relating to a conspiracy in which they did not participate to convict them of the conspiracy charged in the indictment. That argument fails because of our holding that the jury justifiably found a single conspiracy.

The district court explicitly told the jury that it was to determine each defendant's guilt or innocence on the basis of the evidence relating to that defendant. The conspiracy instructions included the following statement:

In determining whether a defendant became a member of the conspiracy you may consider only the acts and statements of that particular defendant.... The government must prove ... from the defendant's own acts and statements, that the defendant was aware of the common purpose and was a willing participant.

The court also gave the following two general limiting instructions:

Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you

must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him.

Where two or more persons are charged with the commission of a crime, ... you must give separate consideration to each individual defendant, and to each separate charge against him. Each defendant is entitled to have his case determined from his own conduct and from the evidence which may be applicable to him.

■ The instructions adequately explained the way in which the jury was to perform its functions and fully protected the defendants' rights. *See United States v. Smith*, 995 F.2d 662, 669–71 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994); *United States v. Briscoe*, 896 F.2d 1476, 1512–17 (7th Cir.), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Viewed as a whole, "as long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." *United States v. Strickland*, 935 F.2d 822, 826 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991). The instructions here met that standard.

## III.

■ All the appellants challenge the admission of the "drug records" seized from Casas' house. These records consisted of a personal telephone directory and a notebook, which contained names, telephone numbers, and records of drug transactions. The district court ruled that the records were "relevant to establish the existence of, and Casas participation in, the charged conspiracy." The court admitted these records as "tools of the trade" and, under Fed.R.Evid. 404(b) "to show motive, intent, preparation, plan and knowledge." The appellants contend that the drug records should have been excluded as irrelevant.

In *United States v. Molinaro*, 877 F.2d 1341 (7th Cir.1989), we upheld the admission of various drug paraphernalia (including a scale and folds for packaging cocaine) seized from the house of one of the conspirators. We stated that "there is no doubt that these items are commonly recognized 'tools of the trade' for narcotics distribution and therefore were relevant to proving the conspiracy to distribute charged in count one." *Id.* at 1345–46. In *United States v. Adamo*, 882 F.2d 1218, 1234 (7th Cir.1989) we similarly sustained the introduction of a scale found in a defendant's apartment because "it is commonly recognized, that a scale is a 'tool of the trade' for dealers of narcotics. *Molinaro*, at 1346. There can be no doubt that evidence of the scale found in Adamo's apartment was relevant in proving that he was a cocaine dealer and a vital member of the conspiracy to distribute cocaine in Peoria, Illinois. *See id.*" *Id.* at 1234.

■ Although the drug records involved in this case were writings rather than physical objects, that did not make them any less tools of the trade. A large scale drug conspiracy such as that involved here cannot operate or function effectively unless detailed records relating to the drug operations are maintained. The records here were not hearsay, since they were not offered to prove the information they contained. Their significance was the fact that they existed, not the details of what they showed.

The district court correctly concluded that they were relevant to prove both the existence of the conspiracy itself and Casas' participation in it. Indeed, the clandestine nature of their storage—in an area above a trapdoor in Casas' bedroom closet—indicates the importance of the records to the conspiracy.

In *United States v. Roldan–Zapata*, 916 F.2d 795, 805 (2d Cir.1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991), the government seized a ledger and a memo book from the apartment of a conspirator. An expert witness testified "regarding the drug-related nature" of the items. *Id.* at 804. In sustaining the admission of the expert testimony, the court of appeals stated: "Even though the narcotics records and other paraphernalia found in Osario–Serna's apartment might have related to other un-

charged offenses, and may not have been specifically used for the March 10 transaction, the jury could infer by their presence that they were tools of the trade in current use. Evidence of their possession at a closely related time is relevant to the charged conspiracy and not a mere showing of bad character, even if it relates to transactions outside the scope of the indictment." *Id.* at 805.

■ We review the district court's admission of the drug records in this case "only for an abuse of discretion." *Molinaro,* 877 F.2d at 1345. The district court did not abuse its discretion in admitting these records as "tools of the [drug] trade." This ruling makes it unnecessary to consider the court's alternative theory that the records also were admissible under Rule 404(b).

■ Nor did the district court abuse its discretion in refusing to give a limiting instruction on the "drug records" evidence. At trial, Casas ultimately objected to such an instruction while the other appellants sought it. After properly balancing all of the appellants' rights and finding no prejudice if no instruction were given, the court declined to give a separate instruction, which would have highlighted the drug records.

## IV.

The appellants Rodriguez and Nava contend that the court should have given an instruction about each of their alleged withdrawals from the conspiracy. Rodriguez contends that he withdrew on September 26, 1989, which was the last date for which there is evidence showing a specific act by Rodriguez in furtherance of the conspiracy. Rodriguez states that on that date he "chose not to continue his involvement with the Pinguino organization...." Nava contends that he withdrew from the conspiracy when he was arrested and imprisoned on June 19, 1989, upon the seizure of the 500 kilograms of cocaine from the truck he was driving.

■ A defendant is entitled to a withdrawal instruction only if the evidence could sustain that claim. *United States v. Andrus,* 775 F.2d 825, 850–51 (7th Cir.1985). "[M]ere cessation of activity is not enough; there

must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators. And the burden of withdrawal lies on the defendant." *United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990).

■ There is no evidence that either Rodriguez or Nava took any affirmative action to withdraw from the conspiracy. The fact that the government introduced no evidence showing actions in furtherance of the conspiracy by Rodriguez after September 26, 1989 cannot be equated with the affirmative action by Rodriguez necessary to show withdrawal. Similarly, the mere fact of Nava's arrest and incarceration was insufficient to show withdrawal, which requires some affirmative volitional act. *Patel,* 879 F.2d at 294. Withdrawal requires that the conspirator make himself "completely unavailable for the conspiracy's purposes." *United States v. Canino,* 949 F.2d 928, 952 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992).

■ Moreover, any alleged withdrawal of these two defendants from the conspiracy was irrelevant in determining their guilt or innocence of the conspiracy charged in the indictment. Neither makes any claim or showing that the denial of a withdrawal instruction prejudiced him, as might be the situation if actions by other conspirators after a particular conspirator withdrew are used to prove the guilt of that withdrawing conspirator. A withdrawal defense to a conspiracy charge is relevant only when "coupled with the defense of statute of limitations." *United States v. Read,* 658 F.2d 1225, 1232–33 (7th Cir.1981). Withdrawal does not absolve a defendant from his membership in the conspiracy. *Id.* As the district court properly recognized, "the fact that he may have withdrawn does not negate that charge."

The jury found that Rodriguez and Nava were members of the conspiracy, and they do not challenge the evidentiary basis for that finding. Accordingly, their alleged with-

drawal would not have had any effect upon the jury's determination of guilt.

The district court properly declined to give the withdrawal instructions that Rodriguez and Nava sought.

## V.

The appellants Nava, Usma and Vasquez contend that they were denied due process by the government's alleged "outrageous misconduct" in this case.

■ Their claim stems from the dictum in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), that the Court might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643. We have recognized "that due process grants wide leeway to law enforcement agents in their investigation of crime," *e.g., United States v. Crump,* 934 F.2d 947, 957 (8th Cir.1991), and that "[t]he determination of what conduct is shocking to the universal concept of justice is essentially a judgment about whether the government has violated the community's moral standards." *United States v. Koller,* 956 F.2d 1408, 1416 (7th Cir.1992). In *Koller,* we pointed out that "we have never reversed a conviction on this ground." *Id.* (quoting from *United States v. White,* 950 F.2d 426, 431 (7th Cir.1991)). The court concluded its discussion of this issue in *Koller* by stating: "Because the governmental conduct here clearly does not meet the standard for outrageous conduct, we need not decide whether this defense continues to have any vitality in this circuit."

Since we here conclude that the government's law enforcement activity similarly "does not meet the standard for outrageous conduct," again we need not consider the continuing vitality of the doctrine in this circuit.

■ A. Nava's claim of outrageous government conduct arises out of the following facts:

Nava was arrested on June 19, indicted on June 22, and arraigned on June 26, 1989. Following arraignment, the government filed under Fed.R.Crim.P. 16(d)(1) an *ex parte, in camera* motion to delay disclosure to Nava of additional incriminating information it had about him. That provision provides:

... the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate. Upon a motion by a party, the court may permit the party to make such a showing, in whole or in part, in the form of a written statement to be inspected by the judge alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the party's statement shall be sealed and preserved in the records of the court ...

The court granted the motion and, on the government's further requests and after additional *ex parte, in camera* hearings, in sealed orders delayed discovery further. On October 6, 1989, on the government's motion, the district court dismissed the indictment against Nava, who was transferred to the custody of the Immigration and Naturalization Service as an illegal alien.

A superseding sealed indictment of Nava and the four other appellants was returned on October 19, 1989. On November 6, 1989, this indictment was unsealed, the four other appellants were arrested and Nava was rearrested. On November 28, 1989, the district court notified defense counsel of the delays in discovery that had taken place pursuant to the court's orders.

The government subsequently disclosed to Nava all of the additional information it had delayed disclosing pursuant to the district court's authorizations. Nava does not contend that the government had not disclosed to him all the material to which he was entitled or point to any prejudice he suffered as a result of the delay in disclosure.

Nothing in this case comes even close to showing outrageous government conduct. To the contrary, the government's delay in disclosing the additional incriminating evidence it had concerning Nava was a justifiable, necessary and proper step to protect its

investigation until it was completed and the other conspirators apprehended. Premature disclosure of that evidence not only would have jeopardized the investigation of a major drug operation, but also could have threatened the life and safety of a number of the persons involved, including the undercover DEA agents and their informants. Both the government's *ex parte* submissions to the district court and the court's authorization of the government's delay in disclosure were authorized by and done in full compliance with Rule 16(d)(1).

■ Nava accuses the government of having filed false and inaccurate pleadings and documents to mislead him. The alleged falsities and inaccuracies, however, were the failure of the government to include in those documents the evidence that the district court authorized the government to delay disclosing and that the government disclosed to Nava after the superseding indictment was returned. Nava's claim, therefore, is not that the government's documents were false—they were all true—but that the government should have disclosed more—a contention we reject.

■ B. Vasquez's and Usma's contention that the government's "outrageous conduct" denied them due process is merely a reformulated reiteration of the entrapment defense they made in the district court, which the court properly rejected before trial. They assert that the government originated the illicit scheme and induced otherwise unwilling individuals to participate. The facts set forth in Part I of this opinion refute that claim. Moreover, neither Vasquez nor Usma requested an entrapment instruction.

■ The DEA agents worked closely and cooperatively with the appellants in helping them effectuate their drug importation scheme, including supplying the transportation used to import the cocaine into and to transport it within the United States. In ferreting out and breaking up such large drug conspiracies, the nature of the clandestine activities frequently requires the government to penetrate and participate in the scheme until the government has developed sufficient evidence to prosecute. But, "the government may go a long way in concert with the [conspirators] without being deemed to have acted so outrageously as to violate due process." *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983). The government did not cross that line here. "[T]he government had merely furnished the opportunity to commit the crime to someone already predisposed to commit it." *United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir.1994) (en banc).

## VI.

Nava argues that the delay in bringing him to trial violated both the Speedy Trial Act and the Sixth Amendment.

The Speedy Trial Act requires that a defendant be brought to trial within 70 days of indictment or arraignment, whichever is later, 18 U.S.C. § 3161(c)(1), but states that specified periods of delay "shall be excluded" in making the time computation. 18 U.S.C. § 3161(h).

■ Nava does not challenge any delay between the unsealing of the superseding indictment on November 6, 1989 and his trial under that indictment. He contends, however, that the government's failure to bring him to trial under the original indictment before that indictment was dismissed on October 6, 1989, violated the Speedy Trial Act and, therefore, precluded his trial for possession of cocaine under the superseding indictment. The argument could not cover his trial under that indictment for conspiracy, since that charge was not made in the original indictment of Nava.

The 70–day period under the first indictment began to run on June 26, 1989, when he was arraigned. 18 U.S.C. § 3161(c)(1). The district court on that date gave the parties until August 8th to file motions, and that period is excludable under 18 U.S.C. § 3161(h)(1)(F). *United States v. Benson*, 941 F.2d 598, 607 (7th Cir.1991) ("any time the district court expressly allows for filing motions is excludable under the Speedy Trial Act"), *amended*, 957 F.2d 301 (7th Cir.1992). As Nava recognizes, his counsel agreed to that exclusion of time. Although Nava ar-

gues that such agreement cannot waive his rights under the Speedy Trial Act, that argument is premised on his theory that the government misled defense counsel and the court with false pleadings and affidavits, an argument we have already rejected. Accordingly, Nava cannot properly claim that his acquiescence in this extension of time to file motions was not "intelligently and understandingly" made. *See generally Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962).

■ The period from October 6 through November 6 also must be excluded under 18 U.S.C. § 3161(h)(6), because the original indictment was dismissed and the superseding indictment was "for the same offense, or any offense required to be joined with that offense." *See United States v. Fuesting*, 845 F.2d 664, 668 (7th Cir.1988).

As the district court correctly ruled, the exclusion of these two extensions of 43 and 31 days from the 133 days between June 26th and November 6th left 59 days of nonexcludable time, which is well within the 70–day limit. Accordingly, Nava's rights under the Speedy Trial Act were not violated.

■ Nava's Sixth Amendment argument is unconvincing. In rejecting that claim, the district court balanced any possible prejudice to Nava from the delay against the government's reasons for delay and properly concluded that the delay did not violate Nava's Sixth Amendment rights. *See Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972).

## VII.

■ In determining Casas' sentence, the district court increased his offense level by four pursuant to section 3B1.1(a) of the Sentencing Guidelines, which provides for such increase if the defendant was an "organizer or leader of criminal activity that involved five or more participants or was extensive." U.S.S.G. § 3B1.1(a). Casas challenges the factual basis for that increase. The district court's determination of a defendant's role in an offense is a finding of fact, which we review under the clearly erroneous standard.

*United States v. Cantero*, 995 F.2d 1407, 1410 (7th Cir.1993).

The factors the court is to consider in determining whether Casas was an "organizer or leader" include: his exercise of decision-making authority; the nature of his participation in the offense; his recruitment of accomplices; his claimed right to a larger share of the fruits of the crime; his degree of participation in planning or organizing the offense; the nature and scope of his illegal activity; and the degree of control and authority he exercised over others. U.S.S.G. § 3B1.1 comment (n. 3); *United States v. Colello*, 16 F.3d 193, 195 (7th Cir.1994).

■ In increasing Casas' offense levels because of his "aggravating role in the offense," the district court "note[d] in particular the fact that you were to receive 300 of the 500 kilos, the many phone calls you made to co-conspirators, and the drug records, which were found concealed in your home." Casas played a major role in organizing the receipt and subsequent distribution of the 500 kilogram drug shipment and was entrusted with large amounts of cash involved in the drug importation. It was to Casas that Usma reported the stopping of the truck containing the 500 kilograms of cocaine. Contrary to Casas' contention, it was not necessary that he directly controlled others as long as he exercised some control over them. *United States v. Carson*, 9 F.3d 576, 585 (7th Cir.1993).

■ The district court, which heard the evidence, is in the best position to determine the part a particular defendant played in the offense. *United States v. Griffin*, 17 F.3d 269, 271 (8th Cir.1994). The court's determination that Casas was an "organizer or leader of" the conspiracy is not clearly erroneous.

## CONCLUSION

The convictions of all the appellants, and the sentence of Casas, are AFFIRMED.