In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3043

United States of America,

Plaintiff-Appellee,

v.

Ernest Spiller,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 CR 30120--William L. Beatty, Judge.

Argued March 1, 2001--Decided August 17, 2001


   Before Harlington Wood, Jr., Manion, and
Diane P. Wood, Circuit Judges.

   Manion, Circuit Judge.  Ernest Spiller
was indicted and found guilty on five
counts relating to his sale of crack
cocaine and possession of firearms.
Spiller appeals his conviction and
sentence, claiming that the district
court committed several errors. We reject
his claims and affirm.

I.  Background

   On July 1, 1999, at two different times,
a confidential informant purchased 3.3
grams and 1.9 grams of crack cocaine from
Ernest Spiller at his residence in East
St. Louis, Illinois. Based on the
confidential informant's purchases, the
next day federal agents obtained a search
warrant for the residence. During the
search, the agent recovered numerous
incriminating items, including $6000 cash
(including the marked buy money), an
elaborate home security system, a scale
with crack residue, a cocaine user
handbook and other drug paraphernalia
such as cans with false bottoms, plastic
baggies, bongs, test tubes and beakers.
The agents also found approximately 12
weapons in the home. In addition, the
agents found handwritten ledgers contain
ing words and phrases, such as "I cook
you cook," "powder," "cut," "soda," and
numbers associated with references to

"grams." However, other than the crack residue on the scale, the searchers found no crack cocaine.

In a superseding indictment, Spiller was charged with five offenses: Count I, distributing 3.3 grams of crack cocaine in violation of 21 U.S.C. sec. 841(a)(1); Count II, distributing 1.9 grams of crack cocaine in violation of 21 U.S.C. sec. 841(a)(1); Count III, maintaining a place for the purposes of manufacturing, distributing and using crack cocaine between November, 1998 and July 2, 1999, in violation of 21 U.S.C. sec. 856; Count IV, possession of a firearm in furtherance of the drug trafficking crime charged in Count III, in violation of 18 U.S.C. sec. 924(c); and Count V, possession of a firearm by a convicted felon[1] in violation of 18 U.S.C. sec. 922(g)(1).

Spiller pleaded not guilty as to all five counts and a jury trial commenced on November 29, 1999. The parties stipulated that the ledgers were seized at Spiller's residence and that certain entries fell within the time period of the superseding indictment.[2] The seizing officer, Kurt Eversman, testified that the ledgers contained "a lot of names with money owed, money paid. It has a lot of things that refer to grams, ounces, soda, cook, just basically different references for the drug trade and information that shows that drug sales were going on." Spiller did not object to this testimony. However, when the government initially sought to introduce the ledgers into evidence, Spiller's attorney objected, stating, "Judge, I'm going to object to the relevancy and that they are immaterial and uncorroborated at this time of the admission of these ledgers." The district court overruled the objection without explanation and admitted the ledgers into evidence.

The government then used two expert witnesses to explain the ledgers. The first witness, William Storer, a handwriting expert, testified that the ledgers contained similar handwriting to Spiller's writing samples. Spiller's attorney did not object to Storer's testimony.

The second witness, Harold Daniel Clouse, an FBI special agent and Drug Records Analyst with over nine years

experience in the field, testified that the ledgers were the records of an illicit drug distribution business, and that during the period from November, 1998 to July 2, 1999, Spiller had produced a minimum of 28,583 grams of crack cocaine. Clouse based his conclusion on the terminology, weights and price per unit he noted in the records and the overall appearance of the documents. Clouse also concluded that the ledgers reflected sales to numerous customers during the relevant time period. On cross-examination, Clouse admitted that the ledgers were unintelligible even to people who normally prosecute and investigate drug cases. However, he testified that, where he was unsure as to the meaning of a notation, he did not include those figures in his calculation. He also stated that the records were fairly well kept and detailed. Clouse did not interview Spiller or any other witness regarding the ledgers. Spiller's attorney objected only once to Clouse's testimony./3 When the government sought to introduce into evidence a table reflecting the amount of cooked cocaine produced each month, she objected, claiming a lack of materiality, relevance and corroboration. In response, the government argued that the evidence was relevant to whether Spiller was maintaining a crack house, and therefore the ledgers were relevant and material. The district court overruled the objection and admitted the exhibit.

In addition to the expert witness testimony, the government produced a number of witnesses who testified that they had purchased various amounts of crack cocaine from Spiller on a regular basis. Glorina Jackson, known as "Glow," testified that during the relevant time period she purchased crack from Spiller and his wife, sometimes more than once a day. She testified that she bought approximately $300 of crack each month from Spiller. She also testified that she never saw Spiller with large amounts of cocaine and never saw him cook any crack cocaine. The next witness was Kim Davis, the informant who made the drug purchases on July 1, 1999. She testified that she purchased crack from Spiller and his wife two to three times per week, spending approximately $300 per week. Regarding the ledgers, Davis testified that some of

the entries may have referenced amounts Spiller believed she owed him. Another witness, Samantha Sayles, known as "Missy," testified that she went to Spiller's house approximately five times per week and spent approximately $150 per week buying crack from him. She also testified that she never saw Spiller cook crack. Finally, Carol Garrett testified that she spent approximately $100 per week buying crack from Spiller and went to his home two to three times per week. The handwritten ledgers contain numerous references to "Kim," "Glo," and "Missy."

On December 2, 1999, the jury returned a verdict, finding Spiller guilty on all five counts. The government filed a pre-sentence investigation report suggesting that Spiller's offense level should be 38, based on relevant conduct for Counts I through III of manufacturing 28,000 grams of crack cocaine, as indicated in the ledgers. Spiller objected to the use of the handwritten ledgers to establish relevant conduct, arguing that they were uncorroborated. Spiller argued that the charged conduct only involved 5.2 grams of crack cocaine, which should have put him at Offense Level 20 for purposes of sentencing. In response, the government noted that Offense Level 38 only required proof of 1,500 grams. Concluding that there was sufficient proof of 1,500 grams of crack cocaine, the district court overruled Spiller's objections regarding relevant conduct./4

Spiller also filed a motion for downward departure based on his age, arguing that the statutory maximums, 30 years, would exceed his life expectancy. At the sentencing hearing, Spiller presented an offer of proof, arguing that according to the National Vital Statistics Report for Tables of Life Expectancy and taking into consideration his age and race, his life expectancy is 25.2 years. His expert, a registered nurse, testified that because he is a smoker, is probably hypoglycemic, has a family history of diabetes and, based on blood tests, has a potential for coronary artery disease, an additional 8.24 years should be subtracted, for a total life expectancy of 16.96 years. The district court rejected Spiller's request for a downward departure.

The district court then sentenced Spiller to the guideline minimums of 292

concurrent months on each of Counts I and II, 240 concurrent months on Count III, 60 consecutive months on Count IV, and 120 concurrent months on Count V, for a total of 352 months (or 29.33 years). Spiller appeals.

## II. Discussion

Spiller presents four arguments on appeal. First, he argues that the district court erred in admitting the handwritten ledgers into evidence at trial because they are inadmissible hearsay. Second, he argues that the district court erred at sentencing by attributing 28,000 grams of crack cocaine to him as relevant conduct based on the ledger testimony. Third, he raises an Apprendi challenge because the district court sentenced him based on relevant conduct, which was not submitted to the jury and proven beyond a reasonable doubt. Last, he argues that the district court erred in sentencing him to a sentence in excess of his life expectancy. Spiller requests that his conviction be reversed, or that his sentence be vacated and remanded for re-sentencing. For the reasons stated below, we affirm.

## A. Admission of Handwritten Ledgers

Spiller's first argument on appeal is that the district court erred in admitting the handwritten ledgers into evidence because they are inadmissible hearsay. Trial courts have broad discretion to admit or exclude evidence, and we review rulings dealing with the admission of evidence only for an abuse of discretion. See United States v. Swanquist, 161 F.3d 1064, 1073 (7th Cir. 1998).

The government argues that the drug records were initially admissible as "tools of the trade" for a crack house to show motive, intent, preparation, plan and knowledge. See Fed. R. Evid. 404(b). Such an admission allows the records to be used to show their existence, which would clearly be relevant to whether a defendant was operating a crack house, here Count III. For example, in United States v. Nava-Salazar, 30 F.3d 788 (7th Cir. 1994), this court held that drug records were properly admitted as tools of the trade, and were not hearsay, since

they were not offered to prove the information they contained. "Their significance was the fact that they existed, not the details of what they showed." Id. at 798. Similarly, the admission of the drug ledgers in this case verified their existence and thus established Spiller's intent to operate a crack house. Accordingly, the district court did not abuse its discretion in admitting the records for this purpose.

However, Spiller's argument on appeal relates to the government's use of the ledgers to show that he produced 28,000 grams of crack cocaine. In other words, he objects to their use to prove the truth of the information they contained, a hearsay objection. The government maintains that since the initial admission of the records was appropriate under Rule 404(b), and since Spiller did not make a continuing hearsay objection, Spiller forfeited his right to object to the use of the ledgers. Generally,

[t]o preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection. Thus, not just any objection will save an issue for review--neither a general objection to the evidence nor a specific objection on a ground other than the one advanced on appeal is enough. Rather, this Court will consider an argument only if the party asserting it made a proper, timely and specific objection on the same ground at trial, that is, unless plain error is manifest.

United States v. Linwood, 142 F.3d 418, 422 (7th Cir. 1998) (internal citations omitted).

Thus, we must decide whether Spiller's objections that the ledgers were "irrelevant, immaterial and uncorroborated" is sufficient to preserve the issue that they constitute inadmissible hearsay. Spiller's objection regarding relevance and materiality is not sufficient to preserve a hearsay objection for appellate review. In fact, much hearsay, even inadmissible hearsay, is relevant and material. However, Spiller's objection based on lack of corroboration is probably sufficient. Lack of reliability and corroboration go

to the heart of the hearsay objection. However, we need not decide the issue because, as discussed below, the records were properly admitted as a statement of a party-opponent.

The government presented evidence that Spiller wrote the ledgers and that they were kept in his own bedroom, where he also kept crack equipment and proceeds./5 A party's own statements offered against him are considered admissions by a party-opponent, and, as such, are not hearsay and are admissible under Fed. R. Evid. 801(d) (2)(A). See United States v. Harvey, 117 F.3d 1044, 1049-50 (7th Cir. 1997) (finding that if diaries referring to marijuana production were written by the defendant, they would not be inadmissible hearsay "because they would be statements made by a party-opponent.")./6

Moreover, even if the records were improperly admitted, any error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967). First, at a minimum, the ledgers were properly admissible as "tools of the trade" for a crack house and could be considered by the jury in that capacity. Additionally, the evidence against Spiller, even apart from the ledgers, persuasively established his guilt. Without the ledgers, the jury still heard ample evidence regarding the drug buys on July 1, 1999, regarding the drug paraphernalia and marked drug money found on his premises, and testimony from the numerous witnesses who purchased crack cocaine from him on a weekly basis during the time period in question. This evidence alone established Spiller's guilt on Counts I through III beyond a reasonable doubt and any error in admitting the drug ledgers was harmless.

B. Relevant Conduct

Next, Spiller argues that, while Counts I and II charged him with distributing a total of 5.2 grams of crack, the district court erred at sentencing by attributing 28,000 grams of crack cocaine to him based on the ledger testimony. He argues that the absence of drugs at his home during the search, the witnesses' testimony regarding the small amounts they purchased, and the inherent unreliability of the ledgers make it

impossible for him to have actually been responsible for the amount of drugs attributed to him by the government.

Initially, we note that at sentencing, "the Government must prove the facts underlying the base offense or an enhancement by a preponderance of the evidence. Furthermore, because the Federal Rules of Evidence do not apply, the district court may hear evidence that would not otherwise be admissible, such as hearsay." United States v. Johnson, 227 F.3d 807, 813 (7th Cir. 2000) (internal citations omitted). "The district court's calculation of the quantity of drugs attributable to [Spiller] during both the offense of his conviction and any other relevant conduct is reviewed only for clear error." Id. In calculating the drug quantities, a district court may "consider a wide range of information" so long as it has "'sufficient indicia of reliability to support its probable accuracy.'" United States v. Robinson, 164 F.3d 1068, 1070 (7th Cir. 1999) (quoting United States v. Taylor, 72 F.3d 533, 543 (7th Cir. 1995)).

The district court adopted the factual findings and guideline application set forth in the government's pre-sentence report. Accordingly, Spiller's relevant conduct was based on 28,000 grams of crack cocaine. This calculation established his base offense level under the Sentencing Guidelines at 38, which only requires proof of 1.5 kilograms. See U.S.S.G. sec. 2D1.1(c)(1). The district court heard evidence regarding the amount of crack cocaine actually purchased from Spiller on July 1, 1999, regarding the amounts purchased by the various witnesses over time and testimony regarding ledgers found in the defendant's home, determined to be in his handwriting and thoroughly explained by an expert. All of this evidence had a sufficient indicia of reliability to support the district court's determination, by a preponderance of the evidence, that the crack quantities far exceeded 1.5 kilograms. Moreover, even without the ledgers, the evidence described sufficiently demonstrated that the quantity of drugs had exceeded 1.5 kilograms. Therefore, it was not clear error to sentence Spiller at an offense level of 38.

While it is less than clear, Spiller also seems to argue that relevant conduct must be proven to the jury beyond a reasonable doubt before it can be used to increase a defendant's sentence. We have rejected this argument "as long as that determination does not result in the imposition of a sentence that exceeds the statutory maximum penalty for that crime." United States v. Jones, 248 F.3d 671, 677 (7th Cir. 2001) (citation omitted). As discussed below, Spiller was not sentenced in excess of the statutory maximum and therefore a jury was not required to find the quantity of drugs beyond a reasonable doubt. That being said, the government's prosecution in this case is subject to criticism. The government sought to attribute 28,000 grams to Spiller as relevant conduct-- over 5000 times the amount for which Spiller was found guilty. Even the minimum 1.5 kilograms necessary to apply base offense level 38 is 1494.8 grams more than the 5.2 grams for which Spiller was actually indicted. "[W]e again remind prosecutors 'not to indict defendants on relatively minor offenses and then seek enhancement sentences later by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted.'" United States v. Bacallao, 149 F.3d 717, 721 (7th Cir. 1998) (quoting United States v. Fischer, 905 F.2d 140, 142 (7th Cir. 1990)).

C.  Apprendi Claims

Next, Spiller argues that his Fifth and Sixth Amendment rights were violated when the district court increased his sentence based on conduct not submitted to the jury and proven beyond a reasonable doubt./7 If a defendant argues that a sentence was imposed in violation of the law, our review is de novo. See United States v. Guy, 174 F.3d 859, 861 (7th Cir. 1999).

The now oft-cited Apprendi rule states that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490

(2000). In this case, the superseding indictment contained the quantities of crack cocaine in Counts I and II, 3.3 grams and 1.9 grams, respectively, but the jury instructions contained no references to drug quantity. For Counts I and II, Spiller was sentenced under 21 U.S.C. sec. 841(b)(1)(c), which provides punishment for conviction of an undetermined amount of crack cocaine. The maximum sentence under this statute is 30 years' imprisonment when the defendant has been previously convicted of a drug felony (as Spiller has been). See 21 U.S.C. sec. 841(b)(1)(C). For Count III, maintaining a drug house, the maximum penalty is 20 years. See 21 U.S.C. sec. 856. Since the sentences Spiller received (24.33 years on Counts I and II and 20 years on Count III) are less than the statutory maximums, Apprendi is not implicated.

Spiller also insinuates that the fact of his prior convictions improperly elevated the statutory maximum from 20 to 30 years. The indictment did not refer to his prior convictions, nor were they submitted to the jury./8 Although Spiller did raise an Apprendi argument regarding drug quantity, he did not do so for the prior convictions. In fact, he did not object at all to the use of the prior convictions at sentencing and acknowledged at the hearing that the maximum for Counts I and II was 30 years. Accordingly, our review is for plain error. United States v. Robinson, 250 F.3d 527, 529 (7th Cir. 2001). No such error occurred. The plain language of Apprendi refutes Spiller's argument: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490 (emphasis added). Therefore, there was no need to submit the issue of a prior conviction to the jury, and the government's introduction of certified copies of Spiller's prior convictions was sufficient to support the district court's conclusion that the statutory maximum was 30 years.

D.  Length of Sentence in Excess of Life Expectancy

Lastly, Spiller argues that his Eighth

Amendment rights/9 were violated when the district court denied his motion for downward departure and sentenced him to 352 months (29.33 years), a sentence exceeding his life expectancy of 16.96 years. We lack jurisdiction to review a district court's refusal to make a downward departure, unless the sentence is imposed in violation of the law or as a result of an incorrect application of the Sentencing Guidelines. See Johnson, 227 F.3d at 816.

Spiller states that he is not making an age-based downward departure request (which would preclude our review of the district court's decision), but rather argues that the sentence was imposed in violation of the law, specifically 21 U.S.C. sec. 841(b)(1)(c), which states that "a person shall be sentenced to a term of not . . . more than life." (emphasis added). Spiller argues that any sentence in excess of his life expectancy is more than life and therefore prohibited under the statute. In support of his position, Spiller cites to Martin, 63 F.3d at 1434, where this court held that "where a legislatively enacted sentencing scheme has expressly deprived a court of the possibility of imposing a life sentence, a sentence for a term of years exceeding the defendant's approximate life expectancy would ordinarily constitute an abuse of discretion."

The district court rejected Spiller's argument, concluding that Martin applied in only limited circumstances. In Martin, the court sentenced a 45-year-old defendant to a 50-year prison term pursuant to 18 U.S.C. sec. 34, following his arson conviction under 18 U.S.C. sec. 844(i). At the time of Martin's trial, Section 34 provided that imposing a sentence of life imprisonment (or the death penalty) must be left to the discretion of the jury./10 Where the jury declined to direct life imprisonment, we found that the district court abused its discretion in circumventing that decision by imposing a sentence so long that it effectively amounted to a life sentence under another name. Id. at 1434. Even in the text of that case, however, we limited its applicability, noting that the later amendment to Section 34 "renders this case something of an historical oddity

whose precise holding may have a limited reach." Martin, 63 F.3d at 1432 n.6. See also United States v. Prevatte, 66 F.3d 840, 844 (7th Cir. 1995) (when sentencing a defendant under Section 34, "[d]etermining the life expectancy of the individual defendant is a matter that ought to be addressed by the district court.").

We have since noted the limited scope of Martin and Prevatte. For example, in United States v. DiDomenico, 78 F.3d 294, 298 (7th Cir.), cert. denied, 519 U.S. 1006 (1996), the defendants were not sentenced pursuant to Section 34 and thus we dismissed their life expectancy arguments as "frivolous." Even under the Martin analysis, the sentencing scheme of 21 U.S.C. sec. 841(b)(1)(c) does not expressly deprive a court of the possibility of imposing a life sentence. Consequently, here, the district judge was free to impose any sentence under the statutory maximum and within the guideline range that he deemed to be appropriate in the proper exercise of his discretion. Accordingly, we reject Spiller's argument that because a particular sentence would be the equivalent of a life sentence, he is entitled to a downward departure. To hold otherwise would be to require that the sentencing judge consider in every case a defendant's life expectancy and we decline to impose such an onerous burden on sentencing judges./11

III. Conclusion

Based on the foregoing reasons, we AFFIRM the decision of the district court.

FOOTNOTES

/1 The felony charged in Count V of the superseding indictment was for unlawful use of weapons in St. Clair County, Illinois in 1996. The parties stipulated to this felony conviction. A certified copy of the prior conviction was attached to the government's Version of the Offense for consideration at sentencing.

/2 Before trial began, the following exchange took place.

Antoniou (Spiller's attorney): "I'm going to have a running objection to the ledgers in general, because I think that it's not obvious that they are all drug ledgers as they are purporting to

be."

Clark (prosecutor): "The way I understand, Vanessa, is that we're stipulating not that they are admissible, but that they simply fall within the time period of the superceding indictment."

Court: "I still have to rule whether they're admissible or not as far as relevance."

Antoniou: "Exactly. I'm not going to stipulate that they're admissible as drug ledgers or admissible otherwise."

/3 This was a separate objection from the objection to the initial admission of the ledgers into evidence.

/4 The district court, however, declined to find that the relevant conduct of 28,000 grams had been proven beyond a reasonable doubt, believing it unnecessary to its determination.

/5 Spiller does not object to the records based on foundation or authentication. The ledgers were found within Spiller's home and a handwriting expert determined that they were in Spiller's own hand. No evidence was presented to suggest that Spiller was not the author of the documents. These circumstances are sufficient to support a finding that the ledgers were written by him.

/6 The government also argues that the ledgers fall under the business records exception to the hearsay rule. See Fed. R. Evid. 803(6). However, there was no testimony by a custodian or any other qualified witness with personal knowledge establishing that the records had been kept in the ordinary course of business or that they were otherwise trustworthy. The expert witnesses were the only witnesses who testified regarding the ledgers and they did so convincingly. Nevertheless, they did not have personal knowledge of the specific transactions described in the ledgers. Without such corroborating testimony, the ledgers do not fall under the business records exception.

/7 At sentencing, the district court stated, "I'm not going to say established beyond a reasonable doubt, but it was certainly ample evidence from which the Court can find that there was 28,000 grams. Which if you read Clouse's testimony or you heard Clouse's testimony, it was convincing, and not necessary that the jury or the Court find beyond a reasonable doubt that it was 28,000 grams, as I understand the law."

/8 These convictions were distinct from the one listed in the indictment for Count V. The government introduced certified copies of these prior

convictions in its Version of the Offense for use at sentencing on Counts I and II.

/9 While the heading in Spiller's brief mentions the Eighth Amendment, nowhere else in his argument does he mention the Eighth Amendment. Arguments not developed on appeal are waived, and therefore we do not address Spiller's life expectancy argument under the Eighth Amendment. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim [for appellate review].") In any event, the very case Spiller relies upon rejected the argument that a lengthy sentence violated the Eighth Amendment. See United States v. Martin, 63 F.3d 1422, 1432 (7th Cir. 1995).

/10 This provision was later amended to remove the jury from sentencing altogether.

/11 The provision for age-based downward departures is sufficient to allow the district court to impose more equitable sentences where appropriate. "Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. sec. 5H1.1. As noted, if this had been a denial of a purely age-based departure request, we would have no authority to review it. In any event, Spiller did not produce any evidence that he is elderly or suffering from any incapacity.